DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
 {¶ 1} Appellant, Ginger Tripp, appeals from three separate judgments by the Summit County Court of Common Pleas which (1) granted summary judgment, on all counts, to Appellees, Beverly Enterprises-Ohio, Inc. ("Beverly-Ohio"), Beverly Healthcare and Rehabilitation Services, Inc. ("BHRS"), and Beverly Rehabilitation, Inc. ("Beverly Rehab"), (2) denied Appellant's motion to vacate the grant of summary judgment, and (3) orally denied Appellant's motions to compel discovery. We affirm.
 {¶ 2} From July 1993 until November 3, 1998, Appellee Beverly-Ohio employed Appellant as Director of Rehabilitation at their Valley View Nursing and Rehabilitation Center ("Valley View"). Employees of Appellee BHRS, the parent corporation of Appellee Beverly-Ohio, directly supervised Appellant in her work at Valley View. In January 1997, personal issues, including failure to reach some life goals and financial problems stemming from litigation over construction of her house, initially led Appellant to seek out the help of a psychologist, Dr. Brian Tindall ("Tindall"). Then, in May 1997, Appellant's father passed away on the same day that her mother was diagnosed with terminal pancreatic cancer. Tindall also discussed these issues with Appellant, and eventually diagnosed her with dysthymic disorder (a life time disorder) and major depressive disorder.
 {¶ 3} When a new administrator, Ken Carroll ("Carroll"), began working at Valley View in January 1998, Appellant advised him of her personal situation. She told Carroll that she was under the care of a psychologist for signs of depression and had difficulty initiating and completing tasks, but that she was resisting taking medication at that time. Appellant felt that she could still accomplish her job, though, and stated that "even half of [her] was better than 100% of most people."
 {¶ 4} Two weeks later, in February 1998, Carroll asked James Wilson, the Group Vice President of Appellee BHRS, to attend a meeting with Appellant. At that meeting, Carroll advised Appellant of complaints that other employees had about her: the employees were afraid of her; she talked down to them; there was a lack of communication in her department; and that morale in general in her department was bad. Appellees offered evidence indicating that similar complaints were ongoing over multiple years and that former directors advised Appellant of those complaints. Appellant, on the other hand, stated that these were the first complaints of their type, and that she had never been advised of any similar problems before. Because Appellant refused to resign at that time, Carroll agreed to give her an action plan to improve her performance as a supervisor. No action plan was ever provided to Appellant.
 {¶ 5} After this meeting, Appellant did not work for two and a half weeks, and began taking Paxil for her depression. For those two and a half weeks, Appellant stated that she could not even get out of bed because she was crying hysterically; her physician put her on suicide watch; and she had daily meetings with her psychologist. When Appellant did return to work, she felt she had no energy and could not even accomplish simple tasks. She did, though, remind Carroll of the promised action plan, which Carroll never gave to her. Appellant also requested that Carroll take into consideration the great stress she was under.
 {¶ 6} In May 1998, Appellant took some time off under the Family Medical Leave Act to take care of her mother. She indicated that she wanted to take off two entire weeks, the last weeks of her mother's life, but she only took off every third or fourth day instead because she was "afraid if [she] wasn't there every day that something would happen." Appellant felt that every time she took off two or three days, she would "come back to these meetings [involving employee complaints against her]." Carroll never refused to permit her to take off the entire two weeks, but did encourage her to continue working her revised schedule instead.
 {¶ 7} After Appellant's mother passed away, during the summer of 1998, Appellant made multiple requests to Carroll for additional help in physical therapy due to a backlog of paperwork. She requested that a physical therapist from a less busy facility be transferred temporarily to help with the work, but Carroll did not respond to her request.
 {¶ 8} In October 1998, Appellees Beverly-Ohio and BHRS were reorganizing delivery of rehabilitation services. All rehabilitation therapists, aides, and assistants working for Appellee Beverly-Ohio would be eliminated, and a new company, Appellee Beverly Rehab, would provide those services. Appellees Beverly-Ohio and Beverly Rehab made alternative offers to Appellant on October 19, 1998: the offer of a new employment position, with fewer supervisory responsibilities, with Appellee Beverly Rehab to begin on January 1, 1999, or five weeks severance pay from Appellee Beverly-Ohio. Appellant signed the employment offer letter, accepting the position on October 23, 1998. Regardless of this, Appellant continued to debate whether she wanted to accept the new position: she did not want to continue working with Carroll. On November 2, the deadline to accept, Appellant called another employee and spoke for an hour about whether she should accept the job. After the conversation, Appellant re-signed the offer and faxed it to Appellee Beverly Rehab.
 {¶ 9} Carroll fired Appellant from employment with Beverly-Ohio the next day, November 3, 1998. Carroll supported his decision with multiple reasons: continued mistreatment of employees, failure to alter her attitude or management style, failure to improve communication skills regardless of multiple meetings on the subject, and, as the final insult, Appellant's referring to the man who would be her new supervisor with Appellee Beverly Rehab as an idiot at a meeting in front of two current employees.
 {¶ 10} Appellant discontinued taking Paxil in July 1999 and then discontinued treatment with her psychologist in September 1999 when Tindall felt she had learned adequate coping skills. For the entire period of time that Appellant was under Tindall's care, she worked not only at Valley View, but also two other physical therapy facilities.
 {¶ 11} Appellant filed a complaint in the Summit County Court of Common Pleas on June 9, 1999 alleging handicap discrimination, breach of contract, promissory estoppel, wrongful discharge in violation of public policy, tortious interference with a business relationship, intentional infliction of emotional distress, and fraud. She later filed an amended complaint to add a claim for discrimination under the Americans With Disabilities Act ("ADA"). Following conclusion of discovery, Appellees filed a motion for summary judgment. Pursuant to Civ.R. 41(A), Appellant voluntarily dismissed the suit the day before her brief in opposition to summary judgment was due.
 {¶ 12} In February 2001, Appellant refiled the same action against Appellees in the United States District Court for the Northern District of Ohio, Eastern Division. After Appellees filed a motion to dismiss that suit on April 6, 2001, Appellant again voluntarily dismissed the case.
 {¶ 13} On April 27, 2001, only a week after dismissing the federal case, Appellant again refiled the same action, including the ADA claim, in the Summit County Court of Common Pleas. Appellees removed the case to federal court based on the ADA claim, whereupon Appellant filed an amended complaint, deleting the ADA claim, and had the case remanded back to state court. The case was assigned to Judge Adams, the same judge originally assigned to the first suit in 1999.
 {¶ 14} Appellant twice moved to compel discovery in August and September 2001 because she claimed that Appellees "wholly failed to provide timely responses to discovery requests, and then * * * refused to provide any of the requested documents." The court orally denied the motion to compel at the pretrial conference on October 1, 2001.
 {¶ 15} Appellees filed their Motion for Summary Judgment on October 12, 2001. Judge Adams left the state bench for the federal bench on February 19, 2003. On February 28, 2003, Judge Chinook, sitting by assignment, granted Appellees' Motion for Summary Judgment in its entirety. Appellant timely appealed that judgment, and then filed a motion to vacate the judgment in the trial court on the grounds that Judge Chinook was not formally assigned to sit on the case. We granted a stay of the appeal for the trial court to rule on the motion to vacate. Judge Chinook denied Appellant's motion to vacate in April 2003. Appellant timely appealed that second judgment to this court. Appellant raises four assignments of error collectively regarding all three judgments below.
 ASSIGNMENT OF ERROR I
"It was error to deny the motion to vacate judgment."
 {¶ 16} In her first assignment of error, Appellant argues that the grant of summary judgment to Appellees is void or voidable because Judge Adams presumably prepared the decision prior to leaving the state bench, but Judge Chinook signed and entered the judgment without a formal assignment to sit for Judge Adams after he left the state bench. Appellant argues that any decision journalized in a judge's name after he leaves the bench is void and that any decision signed by a judge not formally assigned to the case is voidable.
 {¶ 17} The Ohio Constitution permits the Chief Justice of the Ohio Supreme Court to, "as necessity arises, * * * assign any judge of a court of common pleas or a division thereof temporarily to sit or hold court in any other court of common pleas or division thereof[.]" Section 5(A)(3), Article IV, Ohio Constitution. This Section also permits the Supreme Court to adopt rules to facilitate these temporary assignments. Id. Superintendence Rule 4(B)(6) permits a court's administrative judge to "[r]equest, as necessary, the assignment of judges to the court or division by the Chief Justice of the Supreme Court or the presiding judge of the court[.]" The rules do not require anything further for these assignments. See Forsyth v. Feinstein (Feb. 18, 2000), 2nd Dist. No. 99-CA-66.
 {¶ 18} This Court first notes that Chief Justice Moyer did issue a valid, formal Certificate of Assignment granting Judge Chinook the power to preside in the Summit County Court of Common Pleas, General Division, for the weeks of February 24 and March 3, 2003. This assignment might be objectionable for two reasons: (1) it was not filed with the court until March 14, 2003, more than two weeks after Judge Chinook signed the grant of summary judgment; and (2) it was not specifically filed or journalized in this case. As to the first issue, we can find no authority requiring that an otherwise valid Certificate of Assignment be filed with the court to be valid. See Wissel v. Ohio High School Athletic Assn. (1992),78 Ohio App.3d 529, 532. As to the second, we recognize that it may be better practice for courts to place a copy of the assignment in each file handled by the visiting judge. Failure to do so, though, is not reversible error. See Forsyth, supra; State v. Corradetti, 11th Dist. No. 2001-L-092, 2002-Ohio-6577, at ¶ 11-12.
 {¶ 19} Appellant relies heavily upon two cases, neither of which is on point. The first, Faralli Custom Kitchen Bath, Inc. v. Bailey
(1995), 107 Ohio App.3d 598, 600, stated that an order is void if it is signed by a judge while on the bench, but then filed after the judge has left the bench. In this case, though, the newly assigned judge, not the former judge, signed the grant of summary judgment. The second case,White v. Summit Cty. (2000), 138 Ohio App.3d 116, 117, held that, absent an entry indicating a proper transfer, the new judge assuming to act had no authority, rendering his ruling voidable. But in White the original, assigned judge was still sitting on the same bench, while, in our case, the former judge is no longer sitting on the state bench.
 {¶ 20} The purpose behind the rules permitting reassignment or temporary assignment of judges is to "eliminate whimsical transfers" and to "inhibit real or perceived `judge shopping' and judicial favoritism."Berger v. Berger (1981), 3 Ohio App.3d 125, 128. It would be inappropriate for us to permit Appellant to use these same rules to allow her to judge shop for a more favorable opinion, especially where a valid Certificate of Assignment was filed with the court.
 {¶ 21} We also note that the trial court judge mentioned Civ.R. 63(B) in his ruling. This rule relates only to the reassignment of judges after either a jury trial or the filing of findings of fact and law. Neither of these things occurred in this case, and Civ.R. 63(B) is therefore irrelevant. However, while Appellant argues that the judge based his ruling below solely on this irrelevant rule, the judge also specifically referred to other factors, including the valid assignment of the new judge to the case. As the judge did not base his decision solely on this rule, we will not overturn the decision on this ground. Appellant's first assignment of error is overruled.
 ASSIGNMENT OF ERROR II
"It was error to grant summary judgment for [Appellees]."
 {¶ 22} In her second assignment of error, Appellant argues that the trial court erred by granting Appellees' motion for summary judgment. Appellant asserts error in six different contexts: (1) disability discrimination; (2) breach of contract; (3) wrongful discharge in violation of public policy; (4) promissory estoppel; (5) tortious interference with business relationship; and (6) intentional infliction of emotional distress.
 {¶ 23} Summary judgment is proper under Civ.R. 56(C) if:
"(1) No genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party." Temple v. Wean United, Inc. (1977),50 Ohio St.2d 317, 327.
 {¶ 24} This court reviews the trial court's grant of summary judgment de novo. Grafton v. Ohio Edison Co. (1996), 77 Ohio St.3d 102,105. Any doubt must be resolved in the favor of the non-moving party.Viock v. Stowe-Woodward Co. (1983), 13 Ohio App.3d 7, 12.
 {¶ 25} The party moving for summary judgment bears the initial burden of informing the trial court of the basis for the motion and is to identify portions of the record that demonstrate absence of genuine issues of material fact as to an essential element of the non-moving party's claims. Dresher v. Burt (1996), 75 Ohio St.3d 280, 293. The burden then shifts to the non-moving party to offer "specific facts showing that there is a genuine issue for trial." Id. See, also, Civ.R. 56(E). The non-moving party may not rest on the mere allegations and denials in the pleadings, but must submit some evidentiary material showing a genuine dispute over the material facts. Dresher, 75 Ohio St.3d at 293.
 A. Disability Discrimination {¶ 26} First, Appellant maintains that:
"There is substantial evidence from which a jury could find [Appellees] liable for discrimination based on disability [in that Appellees] did not conclusively show that [Appellant] was not a person with a disability [and that Appellant's] disability was not a factor in the termination of [Appellant]."
Specifically, Appellant argues that her depression is a disability under the discrimination statute, and that she has offered evidence tending to show that her depression was a factor in Appellees' decision to fire her.
 {¶ 27} R.C. 4112.02(A) prohibits employer discrimination based on handicap.[1] In order to survive summary judgment, Appellant must demonstrate a prima facie case of handicap discrimination including: (1) that Appellant was handicapped; (2) that her employer took adverse employment action motivated at least in part by her handicap; and (3) that Appellant, even with her handicap, can safely and substantially perform the essential functions of her job with or without a reasonable accommodation. See Cooke v. SGS Tool Co. (April 26, 2000), 9th Dist. No. 19675, at 10, citing Columbus Civ. Serv. Comm. v. McGlone (1998),82 Ohio St.3d 569, 571.
 {¶ 28} After Appellant demonstrates a prima facie case, her employer must produce evidence of a legitimate, nondiscriminatory reason for its action. Hood v. Diamond Products, Inc. (1996), 74 Ohio St.3d 298,302. Appellant must then show that the given reason is mere pretext. Id. Appellees in this case may obtain summary judgment either by showing that Appellant's proffered evidence fails to establish a prima facie case of disability discrimination or by presenting a legitimate, non-discriminatory reason for Appellant's termination over which Appellant fails to create a factual dispute. See Crosier v. Quikey Mfg.Co., Inc. (Feb. 28, 2001), 9th Dist. No. 19863, at 13.
 {¶ 29} If requested, an employer has the duty to make a reasonable accommodation for a handicapped employee, but the burden of requesting the accommodation lies on the employee. Pfost v. Ohio Atty. Gen. (April 20, 1999), 10th Dist. No. 98AP-690; Taylor v. Principal Financial Group
(C.A. 5, 1996), 93 F.3d 155, 165.[2] "The employer is not required to speculate as to the extent of the employee's [handicap] or the employee's need or desire for an accommodation." Gantt v. Wilson Sporting Goods Co.
(C.A. 6, 1998), 143 F.3d 1042, 1046-47. This court has previously considered failure to make a reasonable accommodation in the context of deciding whether an employee could safely and substantially perform the essential functions of his or her job, the third prong of a prima facie case of disability discrimination. See Crosier, supra, at 11-12.
 {¶ 30} Appellant in this case strenuously argues that the mere fact that Appellee Beverly-Ohio failed to accommodate her alleged handicap, either by failing to give Appellant an action plan or failing to get extra help to work on backlogged paperwork, satisfies the second prong of her prima facie case of handicap discrimination. This argument fails for two reasons. First, as noted above, a court considers reasonable accommodation, or lack thereof, in relation to whether the employee could safely and substantially perform her essential job functions, not in relation to the completely separate element of intent. See id. at 13. Appellant may not substitute lack of accommodation for intent.
 {¶ 31} The second major flaw in Appellant's argument is that it assumes Appellant's two requests were, in fact, requests for reasonable accommodations related to her handicap. In this particular case, even when taking all the evidence in the light most favorable to Appellant, neither the repeated requests for the promised action plan, nor the request for additional help, appear to be related to Appellant's alleged handicap. Carroll suggested creating the action plan for Appellant in order to aid her in correcting issues that existed prior to her alleged handicap.[3] We fail to see how Appellant's repeated request for aid in correcting longstanding issues existing prior to her alleged handicap can constitute a request for a reasonable accommodation of that handicap — especially where Appellant gave Carroll reason to believe that her work would not be significantly hindered by her depression.[4] In fact, Appellant admitted in her deposition that she did not really ask for an accommodation at that time, but simply consideration of her feelings.
 {¶ 32} As to the backlogged paperwork, Appellant, in her deposition, blamed this on an increase in demand for physical therapy during the summer, not on her lack of energy stemming from depression. Additionally, in July 1998, about the same time Appellant asked for help with this paperwork, she signed a new job description which included two blank lines specifically for her to request any accommodations. She left them both blank, and admitted that she never requested an accommodation in any job description. She also has offered no evidence to indicate that she told anyone that this request related to her depression. Carroll, her supervisor, should not be required to read her mind to know that this request for aid during a time of increased business actually related specifically to the depression that Appellant had informed him of over six months previously.
 {¶ 33} Appellees, in this case, have brought forth evidence supporting the proposition that Carroll discharged Appellant due to her lack of respect for other employees and supervisors. Appellant has not offered any evidence, beyond the mere assertions in her pleadings, that Appellee Beverly-Ohio either terminated her for her alleged handicap or failed to offer her any requested reasonable accommodation that it understood was related to that handicap. Because we find that Appellant has failed to point to specific evidence creating a factual dispute on this issue, we refrain from discussing the other elements of her prima facie case. We find that the trial court did not err in granting summary judgment to Appellees on this issue.
 B. Breach of Contract {¶ 34} Next, Appellant contends that:
"[Appellees] did not show, beyond factual dispute, that no [Appellee] is liable for breach of contract."
Specifically, Appellant argues that Appellees worded the written employment offer specifically enough to create an employment contract that was not terminable at will.
 {¶ 35} The Ohio Supreme Court has held that:
"In the absence of facts and circumstances which indicate that the agreement is for a specific term, an employment contract which provides for an annual rate of compensation, but makes no provision as to the duration of the employment, is not a contract for one year, but is terminable at will by either party." Henkel v. Educational ResearchCouncil (1976), 45 Ohio St.2d 249, paragraph one of the syllabus.
 {¶ 36} An at-will employee may be discharged at any time, for any reason with only three exceptions: violation of public policy, Phung v.Waste Management., Inc. (1986), 23 Ohio St.3d 100, paragraph one of the syllabus, as modified by Kulch v. Structural Fibers, Inc. (1997),78 Ohio St.3d 134, 149; violation of express contractual provisions, Mersv. Dispatch Printing Co. (1985), 19 Ohio St.3d 100, 104; or promissory estoppel, id.
 {¶ 37} In this case, the written offer to Appellant stated:
"It is understood that Beverly associates are employed at will, therefore this offer letter is not an employment contract, nor is it intended to give an expressed or implied right of continued employment."
 {¶ 38} The offer also included only an hourly wage, and no express term of employment. Regardless of this strong language contrary to Appellant's argument, she contends that a second statement in a separate sheet of paper attached to the offer changes the nature of the employment contract. We disagree. The fact that a second sheet of paper stated that "[t]imely completion of [this offer of employment] will solidify your future employment status with Beverly [Rehab]" does not change the fact that Appellant accepted at-will employment.
 {¶ 39} Appellant's own acts also illustrate her understanding that the offer was for at-will employment: she signed and submitted the offer to Appellee Beverly Rehab on October 23, 1998, but testified that she still had not made up her mind until the deadline date of November 2, 1998. On that day, Appellant called a friend, and discussed whether she should accept the offer. She testified that even after she had submitted her acceptance, she still felt that she could change her mind and find other full time employment. We find that the trial court did not err in granting summary judgment to Appellees on this issue.
 C. Wrongful Discharge in Violation of Public Policy {¶ 40} Third, Appellant contends that:
"It was error to dismiss the claim of wrongful discharge in violation of public policy."
 {¶ 41} Violation of public policy is the first exception to the doctrine that an at-will employee may be discharged for any reason.Greeley v. Miami Valley Maintenance Contrs., Inc. (1990),49 Ohio St.3d 228, 233-34. The elements of the tort of wrongful discharge in violation of public policy are:
"`1. That [a] clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element).
"2. That dismissing employees under circumstances like those involved in the [appellant's] dismissal would jeopardize the public policy (the jeopardy element).
"3. The [appellant's] dismissal was motivated by conduct related to the public policy (the causation element).
"4. The employer lacked overriding legitimate business justification for the dismissal (the overriding justification element).'" Painter v.Graley (1994), 70 Ohio St.3d 377, 384, quoting H. Perritt, The Future of Wrongful Dismissal Claims: Where Does Employer Self Interest Lie? (1989), 58 U.Cin.L.Rev. 397, 398-99. See, also, Kulch,78 Ohio St.3d at 151 (emphasis omitted).
 {¶ 42} In limited situations, a party may sue using this tort regardless of whether there is another statutory remedy. See Ferraro v.B.F. Goodrich Co., 149 Ohio App.3d 301, 2002-Ohio-4398, at ¶ 50-53
(permitting suit for wrongful discharge in violation of public policy based on age discrimination regardless of the fact that a separate statutory remedy exists for age discrimination).
 {¶ 43} In this particular case it is undisputed that a clear public policy exists regarding protection against disability discrimination. See R.C. 4112.01 et seq. However, as noted above, Appellant has failed to provide any evidence beyond the mere allegations in her pleading that Appellant's termination stemmed even in part from her alleged handicap. Appellee Beverly-Ohio has also offered evidence of an overriding business justification for her termination. Appellant, therefore, also fails to meet the fourth prong of wrongful discharge in violation of public policy. She has not produced evidence that Appellant completely lacked such justification. We agree with the trial court on this issue.
 D. Promissory Estoppel {¶ 44} In Appellant's fourth claim regarding summary judgment, she asserts that:
"[Appellees] did not show, beyond factual dispute, that no [Appellee] is liable for promissory estoppel."
Appellant specifically states that she relied to her detriment on the written and verbal employment offers by Appellees in that she forewent searching for another job or accepting the alternative severance package.
 {¶ 45} The second exception to the at-will employment doctrine is promissory estoppel. Doe v. Lodi Community Hosp. (Dec. 13, 2000), 9th Dist. No. 2955-M, at 10-11, citing Mers, 19 Ohio St.3d at 103-104. To succeed on a promissory estoppel claim, Appellant must show: (1) a clear and unambiguous promise; (2) her reliance on that promise; (3) that her reliance was reasonable and foreseeable; and (4) damages caused by that reliance. See Rigby v. Fallsway Equip. Co., Inc., 150 Ohio App.3d 155,2002-Ohio-6120, at ¶ 25, citing Healey v. Republic Powdered Metals,Inc. (1992), 85 Ohio App.3d 281, 284. Appellant "must demonstrate detrimental reliance on specific promises of job security to create an exception to the employment-at-will doctrine." Rigby at ¶ 25, citingWing v. Anchor Media, Ltd. of Texas (1991), 59 Ohio St.3d 108, 110.
 {¶ 46} In this particular case, Appellant has failed to offer any evidence of a clear and unambiguous promise of job security. The offer letter clearly indicates the at-will nature of Appellant's offered employment. The fact that a separate, attached piece of paper states that Appellant could "solidify [her] future employment status" with Appellee Beverly Rehab by returning the offer letter before a specific time does not change this. The statement contained in the offer letter is clear and unambiguous: the offer was for at-will employment only. The statement in the attachment was neither clear nor unambiguous. As such, Appellant may not rely on that statement to support her argument under promissory estoppel. We find that the trial court correctly granted summary judgment to Appellees on this issue.
 E. Tortious Interference with Business Relationship {¶ 47} Appellant's fifth claim of error on summary judgment relates to her claim of tortious interference with business relationship. She alleges that:
"[Appellees] Beverly-Ohio and BHRS did not conclusively show that they did not tortiously interfere with the business relationship between [Appellant] and [Appellee] Beverly Rehab."
Appellant opines that Appellees Beverly-Ohio and BHRS prevented Appellee Beverly Rehab from hiring her.
 {¶ 48} The elements of the tort of tortious interference with a business relationship are: (1) a contractual or business relationship; (2) knowledge of the relationship by the tortfeasor; (3) an intentional and improper act by the tortfeasor preventing formation of a contract, procuring breach of a contract, or terminating a business relationship; (4) lack of privilege on the part of the tortfeasor; and (5) resulting damages. Bryan v. Farrell (Dec. 16, 1998), 9th Dist. No. 18973, at 6, citing Brookeside Ambulance, Inc. v. Walker Ambulance Serv. (1996),112 Ohio App.3d 150, 155-56. A tortfeasor in such a case must act maliciously before courts will permit recovery. Haller v. Borror Corp.
(1990), 50 Ohio St.3d 10, 16. Also, "[e]ven if an actor's interference with another's contract causes damages to be suffered, that interference does not constitute a tort if the interference is justified." Fred SiegelCo., L.P.A. v. Arter Hadden (1999), 85 Ohio St.3d 171, 176.
 {¶ 49} In this particular case, Appellant has failed to provide any evidence that Appellees Beverly-Ohio and BHRS intentionally, maliciously, and improperly, acted in order to prevent formation of a contract or end a business relationship. The evidence on summary judgment shows only that Appellee Beverly-Ohio terminated Appellant's employment for legitimate and non-discriminatory reasons. Appellant offers only the testimony of Ron Grusy ("Grusy"), the employee of Appellee Beverly Rehab who would have supervised Appellant beginning in January 1999, in support of the requisite intent for this claim:
"Q. Why did you offer the position to [someone other than Appellant]? Do you recall why you offered a position to [someone else] * * *?
"A. I would only have done that after I knew that [Appellant] wasn't going to take the position."
"Q. And do you recall how you found out that [Appellant] wasn't going to take that position?
* * *
"A. * * * I was given a status report that these people declined the position and these people accepted [the] position and then I would have known what the staffing arrangement would have looked like as a result.
* * *
"Q. You were just given a list?
"A. I was given a printed list.
"Q. And that list was produced by [the human resources department of Appellee BHRS]?
"A. Yes.
* * *
"Q. * * * And what you remember about [Appellant] is you remember specifically that [Carroll] said that he had decided to terminate her * * * and tell her that. And then he also told you that he had told her that and you don't remember what list, if any, her name appeared on, but you think it must not have appeared on the accept list because if it had, you wouldn't have offered the position to [someone else]?
"A. Yes."
 {¶ 50} This evidence shows that Appellant's name did not appear on a list of employees who accepted future employment. It does not indicate, one way or another, whether this omission was malicious, simply a mistake, or actually even justified. Appellant has failed to offer any evidence showing that Appellees Beverly-Ohio and BHRS acted with the malicious intent to procure breach of any relationship between Appellant and Beverly Rehab. We therefore uphold the grant of summary judgment on this issue.
 F. Intentional Infliction of Emotional Distress {¶ 51} Lastly, Appellant asserts that:
"[Appellees] did not conclusively show that [Appellant] was not subjected to intentional infliction of emotional distress."
 {¶ 52} To prevail on an intentional infliction of emotional distress claim, Appellant must show:
"1) that [Appellees] either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to [Appellant]; 2) that [Appellees'] conduct was so extreme and outrageous as to go `beyond all possible bounds of decency' and was such that it can be considered as `utterly intolerable in a civilized community'; 3) that [Appellees'] actions were the proximate cause of [Appellant's] physic injury; and 4) that the mental anguish suffered by [Appellant] is serious and of a nature that `no reasonable man could be expected to endure it.'" Pyle v. Pyle (1983),11 Ohio App.3d 31, 34, quoting Restatement of the Law 2d, Torts (1965), 73, Section 46, Comment d. See, also, Jarvis v. Gerstenslager Co., 9th Dist. Nos. 02CA0047 and 02CA0048, 2003-Ohio-3165, at ¶ 67.
 {¶ 53} The Supreme Court of Ohio has emphasized that "`mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities'" are insufficient to give rise to a claim of intentional infliction of emotional distress. Yeager v. Local Union 20 (1983), 71,6 Ohio St.3d 369, 375, quoting Restatement of the Law 2d, Torts (1965), Section 46, comment d. Intentional infliction of emotion distress arises when the recitation of the facts to an average member of the community would arouse such resentment against the actor that one would exclaim, "Outrageous!" Id.
 {¶ 54} Appellant argues that:
"It was outrageous and indecent when, just a few days after [Appellant] informed her executive director, with trepidation, that she was under treatment for severe depression and requested consideration of her performance difficulties, [Appellant] was suddenly confronted * * * with accusations of malfeasance which had never been brought up to her. It was outrageous to ignore her requests for consideration of her limitations due to her depression, and to refuse to work with her on a plan of improvement, then again confront her suddenly on November 3, with accusations of misconduct with no opportunity for [Appellant] to address the allegations. It was extreme and outrageous to suddenly fire [Appellant] the day after she reached her agonized decision to accept the Offer of Employment."
 {¶ 55} In other words, Appellant argues that (1) is was outrageous for her employer to discuss ongoing employment issues with Appellant when he knew she was depressed, that (2) it was outrageous for her employer to not give her an action plan to aid in correcting Appellant's bad attitude and disrespect for other employees, and that (3) it was outrageous for her employer to fire her for legitimate reasons the day after she accepted full-time employment with an affiliated, but separate entity (Beverly Rehab), with no chance for her to defend herself. The law simply does not support this.
 {¶ 56} Appellant has failed to present any evidence that the behavior of her employer was outrageous or extreme. Her employer's acts of confronting her with current employment issues in the first instance, failing to help her correct a disrespectful attitude, and then discharging her for her continued lack of respect for her supervisors and fellow employees, are simply not extreme and outrageous. We find that grant of summary judgment on this issue was proper.
 G. Conclusion on Grant of Summary Judgment {¶ 57} Given our preceding analysis, we find that, considering the evidence in the light most favorable to Appellant, there is no genuine issue of material fact as to the issues discussed above and that Appellees were entitled to judgment as a matter of law. As the trial court correctly granted summary judgment to Appellees on these six claims, we overrule Appellant's second assignment of error.
 ASSIGNMENT OF ERROR III
"It was error to dismiss the claim for fraud for failure to plead with particularity."
 {¶ 58} In Appellant's third assignment of error, she contends that the trial court erred in dismissing her claim for fraud for failure to state a claim. Appellant alleges that she adequately plead fraud with the particularity required under Civ.R. 9(B).
 {¶ 59} This court reviews the trial court's dismissal of Appellant's fraud claim de novo. See Jolly v. Anderson, 9th Dist. No. 03CA008210, 2003-Ohio-3142, at ¶ 9. To show fraud, a party must establish:
"(a) a representation * * *,
"(b) which is material to the transaction at hand,
"(c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred,
"(d) with the intent of misleading another into relying upon it,
"(e) justifiable reliance upon the representation or concealment, and
"(f) a resulting injury proximately caused by the reliance." Burr v.Stark Cty. Bd. of Commrs. (1986), 23 Ohio St.3d 69, paragraph two of the syllabus.
 {¶ 60} "In all averments of fraud * * *, the circumstances constituting fraud * * * shall be stated with particularity." Civ.R. 9(B). A party meets the requirement of particularity by specifying (1) the precise statements alleged to be false, (2) the time and place those statements were made, and (3) the defendant that made the allegedly fraudulent statements. Bellinger v. Hewlett-Packard Co., 9th Dist. No. 20744, 2002-Ohio-1643, at ¶ 31, quoting Pollock v. Kanter (1990),68 Ohio App.3d 673, 681-82.
 {¶ 61} Appellant's complaint included the following statements:
"19. [Appellant] incorporates all prior allegations here.
"20. [Appellees] made offers and representations to [Appellant] with intention to mislead [Appellant] into relying upon them, yet [Appellees] intended to deny [Appellant] the promised benefits, and/or acted with utter disregard for whether [Appellees] would provide the promised benefits to [Appellant], such that [Appellees] acted with fraud."
 {¶ 62} One of the preceding allegations under Appellant's breach of contract claim stated:
"7. During 1998, [Appellees] announced that there would be a restructuring of rehabilitation staffing, to be effective January 1, 1999. In October, 1998, [Appellees] made two offers to [Appellant], which were set forth verbally and in writing: (1) employment with [Appellee] Beverly-Ohio through December 31, 1998, with five weeks [of] severance pay and outplacement services, and (2) employment with [Appellee] Beverly-Ohio through December 31, 1998, followed by employment in a new position with [Appellee] Beverly Rehab effective January 1, 1999."
 {¶ 63} Appellant alleges that this incorporated paragraph is enough to meet the particularity requirement under Civ.R. 9(B). Appellant supports her argument with three cases: Aluminum Line Products Co. v.Brad Smith Roofing Co., Inc. (1996), 109 Ohio App.3d 246; Baker v.Conlan (1990), 66 Ohio App.3d 454; and Korodi v. Minot (1987),40 Ohio App.3d 1. The complaint in Aluminum Line specified that statements, made at the time of roof installation or repair, by "Defendant Smith personally and by the other Defendants" fraudulently indicated that a new roof would cure any problems in the original roof,109 Ohio App.3d at 260; the Baker complaint pointed to specific misrepresentations by "Conlan [an individual] and Shawnee [a corporation]" in a written prospectus given to prospective investors at or around the time each invested, 66 Ohio App.3d at 458-59; the Korodi
complaint indicated that three specified individuals made specific misrepresentations at the time those individuals solicited the plaintiff, 40 Ohio App.3d at 5-6.
 {¶ 64} These three cases are distinguishable from the case at bar: Appellant's complaint fails to indicate any individual responsible for the alleged misrepresentations. A corporation can only act through its employees. Chatman v. Progressive Cas. Ins. Co. (Dec. 3, 2003), 9th Dist. No. 21592, 2003-Ohio-6455, at ¶ 8, quoting Scott-Pontzer v.Liberty Mut. Fire Ins. Co. (1999), 85 Ohio St.3d 660, 664. In this case, Appellees are three separate corporate entities. We cannot expect Appellees to talk to every single one of their employees to determine which ones may have made possible misrepresentations to Appellant sometime in the month of October 1998. An allegation that during the month of October some part of a corporate entity made an allegedly fraudulent statement is simply not enough to inform Appellees of the specific claim against them. We overrule Appellant's third assignment of error.
 ASSIGNMENT OF ERROR IV
"The court abused its discretion when it denied [Appellant's] motion to compel discovery."
 {¶ 65} In her final assignment of error, Appellant argues that the trial court should have granted her motions to compel discovery. Specifically, Appellant alleges that Appellees waived their right to object to discovery due to failure to timely respond to discovery requests. If they did not waive their objections, Appellant also states that the given objections were without merit.
 {¶ 66} A trial court may exercise broad discretion when ruling on a motion to compel discovery. Aames Capital Corp. v. Wells, 9th Dist. No. 20703, 2002-Ohio-1498, at ¶ 45. Absent an abuse of discretion, this court will not overturn the trial court's ruling on a motion to compel. See State ex rel. The V Cos. v. Marshall (1998), 81 Ohio St.3d 467, 469.
 {¶ 67} In this particular case, we note that there is no evidence on the record of any ruling by the trial court on this issue. Appellant failed to provide this court with a copy of the transcript for the hearing where the trial court made its alleged ruling and nothing has been journalized on the matter. Where the trial court fails to rule on a motion, this court must consider that motion as implicitly denied. SeeAkron v. Molyneaux (2001), 144 Ohio App.3d 421, 425; Georgeoff v.O'Brien (1995), 105 Ohio App.3d 373, 378; Polivka v. Cox, 10th Dist. No. 02AP-1364, 2003-Ohio-4371, at ¶ 23. Therefore, we must assume that, even without a formal ruling, the trial court implicitly denied Appellant's motions to compel discovery.
 {¶ 68} Even though we must assume that the trial court implicitly denied Appellant's motions to compel, we reiterate the fact that the record does not illustrate any explicit ruling on Appellant's motions to compel. When a trial court fails to explicitly rule on a pending motion to compel while considering a summary judgment motion:
"the party opposing summary judgment must seek a delay of the court's ruling pursuant to Civ.R. 56(F) or otherwise include in their response to the motion for summary judgment some allegation of prejudice as a result of the court's failure to rule." Polivka at ¶ 23, citing Fernandezv. Anheuser-Busch, 10th Dist. No. 01AP-1279, 2002-Ohio-3355, at ¶ 11-12.
 {¶ 69} If a party fails to file a motion under Civ.R. 56(F),[5]
or does not, in their response to a summary judgment motion, show prejudice resulting from failure to receive the discovery requested, that party fails to preserve the issue for appeal. Polivka at ¶ 23-24. See, also, Stegawski v. Cleveland Anesthesia Group, Inc. (1987),37 Ohio App.3d 78, 87. Appellant in the case at bar did not preserve this issue for appeal. The docket clearly reflects that Appellant did not file a Civ.R. 56(F) motion, and Appellant's response to Appellees' motion for summary judgment merely mentioned the fact that the court did not compel discovery without alleging any resulting prejudice to Appellant's ability to rebut Appellees' summary judgment motion. We, therefore, overrule Appellant's fourth assignment of error.
 {¶ 70} For the reasons above, we overrule Appellant's four assignments of error. The judgments of the Summit County Court of Common Pleas are affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
Exceptions.
Batchelder, J., concurs.
[1] All references to the Ohio Revised Code are to the version in effect at the time of the incidents in question. The current version replaces the term `handicap' with the word `disability,' but makes no substantive changes in regard to the remaining relevant language.
[2] Ohio courts may look to federal regulations and law relating to the ADA to interpret Ohio's anti-discrimination laws. Columbus Civ. Serv.Comm., 82 Ohio St.3d at 573; Shaver v. Wolske Blue (2000),138 Ohio App.3d 653, 663; Wooten v. Columbus, Div. of Water (1993),91 Ohio App.3d 326, 334.
[3] Even if we accept as true that Appellant was not told of these issues prior to the first meeting with Carroll, Appellant has offered no evidence to place in dispute the affidavits of other administrators who had similar complaints about Appellant many years prior to the meeting.
[4] Appellant told Carroll at that time that "even half of me is better than 100% of most people." This statement also indicates that Carroll could not have known that Appellant's depression was a handicap. While it shows that her depression hindered her personally, she obviously believed that she could still perform better than the average person. If this qualifies as a handicap, the average person is eternally handicapped.
[5] Civ.R. 56(F) permits the court to delay a ruling on a summary judgment motion until the party opposing the motion has a chance to conduct discovery necessary for rebuttal.